**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

NATIONAL FEDERATION OF THE BLIND,
on behalf of its members and itself,
200 East Wells Street
Baltimore, Maryland 21230,

MARC MAURER
2116 Drummond Road
Catonsville, Maryland 21228,

and

ANIL LEWIS
1201 W. Mount Royal Avenue
Baltimore, Maryland 21217

                Plaintiffs,

v.

UNITED STATES DEPARTMENT OF
TRANSPORTATION
1200 New Jersey Avenue, SE
Washington, D.C. 20590,

and

ANTHONY FOXX, in his official capacity,
Secretary, United States Department of
Transportation
1200 New Jersey Avenue, SE
Washington, D.C. 20590,

      Defendants.

Case No. _____

---

**COMPLAINT FOR JUDICIAL REVIEW AND
DECLARATORY AND INJUNCTIVE RELIEF**

1.      Plaintiffs NATIONAL FEDERATION OF THE BLIND ("NFB"), MARC

MAURER, and ANIL LEWIS, pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C.

§§ 701 – 706, seek judicial review of regulations promulgated by Defendants, the UNITED

STATES DEPARTMENT OF TRANSPORTATION ("DOT"), and Secretary of the United

States Department of Transportation, ANTHONY FOXX, in his official capacity.

2.      Plaintiffs seek declaratory and injunctive relief against Defendants for violating

federal law including the APA and the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705.

Specifically, Plaintiffs seek an Order from this Court declaring unlawful, vacating, and enjoining

implementation of Defendants' recently-promulgated Final Rule regarding visual accessibility

requirements for automated airport kiosks provided by airlines insofar as that Final Rule (a)

allows airlines not to comply with the ACAA's mandate of nondiscrimination by making less

than all of their automated airport kiosks accessible to blind individuals, and (b) delays by 36

months any requirement that airlines comply with the kiosk accessibility requirements. *See*

Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and

Automated Kiosks at U.S. Airports, 78 Fed. Reg. 67882 (Nov. 12, 2013) (to be codified at 14

C.F.R. § 382.57(a)(1)-(2)).

3.      This Court can grant declaratory relief pursuant to 28 U.S.C. § 2201 and

injunctive relief pursuant to 28 U.S.C. § 2202.  Both declaratory and injunctive relief are also

available in actions against the United States pursuant to the APA, 5 U.S.C. § 702.

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises

under the laws of the United States.  Jurisdiction also exists pursuant to 28 U.S.C. § 1346.

## VENUE

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e).  Defendant,

DOT, resides in this District, and a substantial part of the events giving rise to the claim occurred

in this District.

## PARTIES

6.      Plaintiff NFB, the oldest and largest national organization of blind persons, is a non-profit corporation duly organized under the laws of the District of Columbia with its principal place of business in Baltimore, Maryland.  It has affiliates in all 50 states, Washington, D.C., and Puerto Rico.  The vast majority of its approximately 50,000 members are blind persons who are recognized as a protected class under federal law.  The NFB is widely recognized by the public, Congress, executive agencies of government and the courts as a collective and representative voice on behalf of blind Americans and their families.  The purpose of the NFB is to promote the general welfare of the blind by (1) assisting the blind in their efforts to integrate themselves into society on terms of equality and (2) removing barriers and changing social attitudes, stereotypes and mistaken beliefs that sighted and blind persons hold concerning the limitations created by blindness and that result in the denial of opportunity to blind persons in virtually every sphere of life.  The NFB and many of its members have long been actively involved in promoting accessible technology for the blind, so that blind persons can live and work independently in today's technology-dependent world.  NFB members reside throughout the United States, including in the District of Columbia.  Many NFB members would use airport kiosks if they were accessible by the blind.  The NFB sues on behalf of its members throughout the United States, as well as in furtherance of its extensive efforts and expenditure of resources in promoting two of its principal missions: independence of the blind and equal access to technology for the blind.  Defendants' regulations perpetuate the discriminatory use of inaccessible kiosks and frustrate these missions of the NFB.

7.      Plaintiff Marc Maurer is a citizen and resident of Maryland.  Dr. Maurer is legally blind and is President of the NFB, a position he has held since 1986.  As President of the NFB,

Dr. Maurer flies both domestically and internationally to attend meetings with the NFB's stakeholders and leaders around the globe, as well as to speak at symposia and events, and attend to NFB-related matters. In the past 12 months alone, Dr. Maurer flew at least 40 times.  Because airline kiosks are inaccessible to him, Dr. Maurer is routinely forced to rely on sighted airline and hotel personnel to provide him with his boarding pass, which presents problems.  For example, on multiple occasions Dr. Maurer has sought assistance from airline or airport personnel who, even though they were designated to help disabled passengers with kiosk transactions, were, in fact, unfamiliar with the kiosk's operation.  On at least one occasion, Dr. Maurer missed a flight with a short connection because he could not independently obtain the information he needed from an airline's kiosk.  If airline kiosks were accessible to him, Dr. Maurer would use them on a regular basis.

8.     Plaintiff Anil Lewis is also citizen and resident of Maryland who is legally blind. Mr. Lewis is both a member and an employee of the NFB where he is the Director of Advocacy and Policy.  As a requirement of his job, Mr. Lewis flies, approximately, on a monthly basis. Mr. Lewis also frequently flies to Atlanta, Georgia to visit family.  Although he is a longtime traveler and a proficient user of screen-access software, Mr. Lewis has never been able to use an airline kiosk independently because they require vision to operate.  If he is unable to print his boarding pass, or make required itinerary changes before arriving at the airport, or if he needs a replacement boarding pass, Mr. Lewis is often forced to wait for a very long time at a kiosk to be assisted by an airline representative.  Other times, when airline personnel have not been available to assist him, Mr. Lewis has resorted to asking strangers for help using airline kiosks. Sometimes this requires that he provide them with his credit card or reservation confirmation number.  These experiences are degrading to Mr. Lewis who is otherwise an avid and

independent traveler and who would perform the necessary transactions himself if the airlines' kiosks were accessible.

9.     Defendant DOT is the federal agency charged with administering and enforcing the ACAA's mandate of non-discrimination.  The DOT is headquartered in Washington, D.C.

10.     Defendant Anthony Foxx is the Secretary of the DOT.  When the ACAA was first passed, the Secretary was charged with "promulgat[ing] regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with the safe carriage of all passengers on air carriers."  Air Carrier Access Act of 1986, Pub. L. No. 99-435, § 3, 100 Stat. 1080 (1986).

## HISTORY OF THE ACAA

11.     The ACAA was passed and signed into law in 1986.  It was enacted in response to the Supreme Court's decision in *U.S. Department of Transportation v. Paralyzed Veterans of America*, 477 U.S. 597 (1986), which held that air carriers were not subject to the disability rights provisions of § 504 of the Rehabilitation Act of 1973 because they did not receive federal financial assistance.

12.     The ACAA's mandate is straightforward.  The statute reads, in relevant part:

> In providing air transportation, an air carrier, including (subject to section 40105(b)) any foreign air carrier, **may not discriminate** against any otherwise qualified individual on the following grounds:
>
>> (1) the individual has a physical or mental impairment that substantially limits one or more major life activities.
>> (2) the individual has a record of such an impairment.
>> (3) the individual is regarded as having such an impairment.

49 U.S.C. § 41704(a) (emphasis added).

13.     As the Senate Committee on Commerce, Science, and Transportation noted in its report recommending passage of the ACAA, "the practical effect of DOT v. PVA [was] to leave

handicapped air travelers subject to the possibility of discriminatory, inconsistent and unpredictable treatment on the part of air carriers." S. Rep. 99-400 at 2.

14.     The report also emphasized the Committee's intent "that airlines will not, in providing air transportation, impose upon handicapped travelers any regulations or restrictions unrelated to safety and unrelated to the nature and extent of any individual's handicap." *Id.* at 4.

15.     Title III of the Americans with Disabilities Act does not cover public transportation by aircraft, and, according to the Department of Justice, which is responsible for implementing the ADA, "[t]he operations of any portion of any airport that are under the control of an air carrier are covered by the Air Carrier Access Act." 28 C.F.R. § 36 app. C.

16.     The DOT first issued regulations under the ACAA in 1990.

## AUTOMATED AIRLINE KIOSKS

17.     The first electronic, automated ticket kiosk was deployed by Pacific Southwest Airlines in 1977.

18.     Airlines began large-scale use of automated kiosks by 1995. That generation of kiosks had push buttons for users to interact with the machine.

19.     As second-generation kiosks were developed, the push buttons were replaced with flat touchscreen interfaces that the blind cannot use because the kiosk does not translate the prompts into a medium that is accessible to the blind, such as audio output. Vision is required to successfully use this particular implementation of touch-screen technology. With the proper programming, touch-screen technology can be made accessible to the blind.

20.     The current generation of kiosks allows travelers to access information about flights, check in for flights, print tickets and boarding passes, select seats, upgrade to business or first class cabins, check baggage, and perform other transactions relevant to their air travel plans.

21.     No airline has deployed an accessible automated kiosk despite the long-standing availability of such kiosks from vendors such as IBM:  "In May 2007, experts from IBM presented our perspective and demonstrated our solutions [for 'accessible self-service travel kiosks'] to other suppliers, airport authorities, airlines and leading accessibility experts at a meeting of the CUSS Disabilities Sub-Group."  The need for accessible self-service travel kiosks, http://www-03.ibm.com/able/news/selfservkiosk.html (last accessed Jan. 16, 2014).  IBM has also said that its accessible kiosks incorporate "many hardware and software accessibility features that are now available in IBM self-service kiosk solutions for hotels and airlines and airports."  *Id.* (emphasis added).

## THE CURRENT RULEMAKING

22.     In 2004, the DOT began the process of updating its ACAA regulations.  It issued a Notice of Proposed Rulemaking ("2004 NPRM") which noted that "[o]ne feature now found at airports that was not present when the original ACAA rule was issued in 1990 is the electronic ticketing kiosk."  Nondiscrimination on the Basis of Disability in Air Travel, 69 Fed. Reg. 64364, 64370 (proposed Nov. 4, 2004).  Thus, the DOT sought "comment on the accessibility of these devices."  *Id.*  Specifically, the DOT asked for comment on whether kiosks were "accessible to persons with mobility or vision impairments" and whether "the final ACAA rule [should] contain specific accessibility requirements for them" and, if so, what those requirements should be.  *Id.*

23.     In 2008, the DOT issued a Final Rule following the 2004 NPRM ("2008 Final Rule").  Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed. Reg. 27614 (May 13, 2008).  Therein, the DOT noted that "[d]isability community commenters generally expressed support" for making kiosks accessible, while "carriers and their organizations

generally expressed concern about the cost and technical feasibility of accessible kiosks." *Id.* at

27619.  The Department stated that it believed "that all services available to the general public

should be accessible to people with disabilities." *Id.*  Nonetheless, because the DOT did not feel

that it had received commentary sufficient to resolve "questions about cost and technical issues"

it made clear its intention to issue a supplemental notice of proposed rulemaking on the issue of

kiosk accessibility.  *Id.*  In the meantime, however, the 2008 Final Rule required "carrier[s]

whose kiosks are not accessible to provide equivalent service to passengers with disabilities who

cannot use the kiosks." *Id.*

24.      In 2011, the DOT issued its promised supplemental notice of proposed

rulemaking ("the SNPRM") specific to the issues of airline website and kiosk accessibility.

Nondiscrimination on the Basis of Disability in Air Travel: Accessibility of Web Sites and

Automated Kiosks at U.S. Airports, 76 Fed. Reg. 59307 (proposed Sept. 26, 2011).  There, the

DOT stated that it "believes that accessibility for people with disabilities cannot be viewed as a

dispensable design feature." *Id.* at 59318.  It noted that "IBM, a leading manufacturer of kiosks

and other self-service applications, has developed an automated airport kiosk equipped with an

industry standard audio connector, accessible hardware controls, and text-to-speech output," and

that tests by dozens of individuals with vision impairments allowed those individuals "to

complete the check-in process with an unprecedented level of independence." *Id.*

25.      In the SNPRM, the DOT proposed to amend the ACAA regulations "to require

U.S. and foreign air carriers at every U.S. airport with 10,000 or more enplanements per year

where they own, lease, or control automated kiosks providing flight-related services to their

customers (e.g., ticket purchase, seat selection, issuance of boarding passes, bag tags, etc.) to

ensure that <u>all new kiosk orders initiated 60 days after the rule's effective date are for accessible</u>

units." *Id.* (emphasis added). The DOT noted that there were "difficulties with any proposed requirement that would result in less than 100% accessible automated kiosks at an airport." *Id.* The DOT stated that it would require carriers to ensure that each accessible kiosk they own be identified as such, "[u]ntil all automated kiosks in an airport location are accessible." *Id.* at 59319.

26. Nonetheless, the DOT solicited public comment. Specifically, the DOT asked:

a. "Should the proposed time frame for accessible kiosks (i.e., kiosks ordered 60 days after the effective date of the rule) be reduced or increased assuming the rule is effective 30 days after publication in the Federal Register? Is it reasonable to require that all new kiosk orders initiated after the effective date of the rule be for accessible models? Should there be a delay in the effective date of this provision? If so, what is a reasonable amount of time to delay the effective date of this provision?" *Id.* at 59320.

b. "Would a requirement for accessible automated airport kiosks have a significant impact on the cost, inventory, or delivery of such kiosks, and if so, for how long? Can manufacturers of accessible automated airport kiosks meet the market demand if 100% of new kiosks ordered starting 60 days after the final rule's effective date be accessible? If not, up to what percentage of new automated airport kiosks could the Department require to be accessible (e.g., 50% or 75%) before the demand would exceed what the manufacturers could meet?" *Id.* at 59321.

c. "Should less than 100% of new automated airport kiosks ordered after the effective date of the rule be required to be accessible? If so, what is a reasonable percentage to be accessible at each airport location? If only some kiosks are accessible at each location, how would carriers ensure that the accessible kiosks are available to passengers with disabilities when needed? Would a phasing in period over 10 years, gradually increasing the percentage of automated airport kiosks required to be accessible, meaningfully reduce the costs of implementing this requirement (e.g., 25% of new automated kiosks must be accessible within 3 years of the rule's effective date, 50% within 5 years, 75% within 7 years and 100% within 10 years)?" *Id.* at 59320.

27. The period for public comment closed on January 9, 2012. The DOT received 84 comments in response to the issues it raised in the SNPRM. None of the comments were from manufacturers of automated airport kiosks.

28.     The DOT announced its Final Rule on kiosk accessibility on November 4, 2013, exactly nine years to the day after it first broached the topic.  The Final Rule was published in the Federal Register on November 12, 2013 and took effect on December 12, 2013.

29.     The Final Rule differed significantly from the SNPRM.  In particular, the Final Rule:

> a.  Extended the deadline for airlines to begin ordering accessible kiosks from 60 days following the rule's effective date (February 10, 2014) to 36 months following the effective date (December 12, 2016).
>
> b.  Limited the percentage of kiosks that must be accessible to 25 percent of all kiosks at any given airport location with 10,000 or more enplanements per year, rather than 100 percent as originally contemplated and allowed ten years for the airlines to reach the ceiling of 25 percent accessibility.

78 Fed. Reg. at 67906-67908 (to be codified at 14 C.F.R. § 382.57(a)(1)-(2)).  Thus, contrary to Congress' intent, as evidenced by both the text of the ACAA and its legislative history, the DOT's Final Rule legitimates discrimination against blind individuals, with regard to matters unrelated to safety, by permitting airlines to provide them with less than full and equal access to their automated kiosks.

30.     The Final Rule is a "final agency action for which there is no other adequate remedy in a court" and is therefore subject to judicial review.  5 U.S.C. § 704.

31.     The rulemaking violates federal law in no fewer than four ways as addressed in Counts I through IV.

**COUNT I**
**Violation of the APA, 5 U.S.C. § 706(2)(C)**
**Final Rule Issued in Excess of Statutory Jurisdiction**

32.     Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint, as though fully set forth herein.

33.     The APA requires courts that review agency actions to "hold unlawful and set aside agency action, findings, and conclusions of law" which are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

34.     As legal authority for its Final Rule, the DOT cited 49 U.S.C. §§ 41702, 41705, 41712, and 41310.  67 Fed. Reg. at 67883.

  a.   Section 41702, provides only that "[a]n air carrier shall provide safe and adequate air transportation."

  b.   Section 41705 is the ACAA, *see supra* ¶ 10.  When the ACAA was originally passed, Congress instructed that:

> Within one hundred and twenty days after the date of enactment of this Act, the Secretary of Transportation shall promulgate regulations to ensure non-discriminatory treatment of qualified handicapped individuals consistent with safe carriage of all passengers on air carriers.

Pub. L. No. 99-435, § 3, 100 Stat. 1080.

  c.   Section 41712 provides the Secretary of Transportation with the authority to investigate unfair and deceptive trade practices or methods of unfair competition in air transportation or the sale of air transportation.

  d.   Section 41310 provides that air carriers "may not subject a person, place, port, or type of traffic in foreign air transportation to unreasonable discrimination."

35.     None of the purported bases for the rulemaking cited in the Final Rule provide the DOT with the authority to regulate automated airport kiosks, let alone permit airlines to limit the accessibility of their automated airport kiosks.

36.     Defendants' reliance on the ACAA for authority permitting them to regulate kiosk accessibility is particularly out of place.  The ACAA's legislative history reveals that Congress was concerned about the safe carriage of individuals with disabilities.  Thus, it confirms that Congress intended that the ACAA would apply only to the transportation of passengers from point-to-point:

    a.   A chief concern that Congress sought to remedy by passing the ACAA was that travelers with disabilities were being "forced to comply with requirements which are unrelated to safety and are not imposed on other travelers."  S. Rep. 99-400 at 3.

    b.   In its Report recommending passage of the ACAA, the Senate Committee on Commerce, Science, and Transportation noted its intent "that airlines will not, in providing air transportation, impose upon handicapped travelers any regulations or restrictions unrelated to safety and unrelated to the nature and extent of any individual's handicap."  *Id.* at 4

    c.   While noting that the Secretary of Transportation was given discretion to promulgate regulations under the ACAA, the Committee "urge[d] that these regulations require that airline procedures for transporting handicapped individuals distinguish between the differing abilities of handicapped persons, and that any airline procedures applicable only to handicapped passengers be related to safety considerations."  *Id.* at 4-5.

d.   In a colloquy on the Senate floor between Senator Robert Dole, the ACAA's

principal sponsor, and Senator Howard Metzenbaum, "in order that the intent

of S. 2703, the Air Carrier Access Act, may be clarified," 132 Cong. Rec.

S11784-08, Senator Dole stated:

> Our intent in S. 2703 is that so long as the procedures of each
> airline are safe as determined by the FAA, there should be no
> restrictions placed upon air travel by handicapped persons. Any
> restrictions that the procedures may impose must be only for
> safety reasons found necessary by the FAA. Beyond this, the
> Secretary of Transportation should review each airline's
> procedures in light of the regulations to be promulgated
> pursuant to S. 2703 to ensure that the procedures of each airline
> do not contain discriminatory requirements.

*Id.*

37.   Because automated airport kiosks are not related to the point-to-point

transportation of passengers, they cannot be regulated pursuant to the ACAA.

38.   Defendants violated the APA by issuing the Final Rule "in excess of statutory

jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(C).  The Final Rule must be held

unlawful and set aside.  *Id.*

39.   As a result of Defendants' violation, Plaintiffs have suffered and will continue to

suffer the harm of being discriminated against on account of their disability by being denied

equal access to airlines' automated airport kiosks.

40.   Plaintiffs have no adequate administrative remedy for Defendants' unlawful

action as described herein.

**COUNT II**
**Violation of the APA, 5 U.S.C. § 706(2)(A) & (C)**
<u>**Improper Reliance on Airlines' Cost of Complying with Accessibility Requirements**</u>

41.     Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint, as though fully set forth herein.

42.     The APA requires courts that review agency actions to "hold unlawful and set aside agency action, findings, and conclusions of law" which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Id.* § 706(2)(A).  Agency action is improper under this standard if the agency "has relied on factors which Congress did not intend it to consider."  *Motor Vehicle Mfrs. Ass'n  of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

43.     The APA also requires courts that review agency actions to "hold unlawful and set aside agency action, findings, and conclusions of law" which are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(C).

44.     To the extent that Defendants are permitted to regulate automated airport kiosk accessibility, the Final Rule's approval of limitations on blind individuals' access to airlines' automated airport kiosks, which are unrelated to safety,  is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A), and lacks any statutory basis under the ACAA.  *Id.* § 706(2)(C).

45.     In support of the Final Rule, Defendants credited the airlines' assertions that installing accessible kiosks would be "costly."  78 Fed. Reg. at 67908.  As a result, Defendants determined that requiring only "25 percent of airport kiosks [to be] accessible (as opposed to more than 25 percent), in combination with priority access for passengers with disabilities to those kiosks, will enable passengers with disabilities to independently use airport kiosks and

limit the additional costs to carriers and airports associated with acquiring and installing accessible kiosks." *Id.*

46.     The cost of complying with the ACAA is not a factor that Congress instructed Defendants could consider when promulgating regulations to ensure that the law's mandate of non-discrimination is met.

47.     The ACAA mandates that air carriers "may not discriminate" against individuals with disabilities.  49 U.S.C. § 41705(a).  The ACAA leaves no room for any scheme whereby blind individuals are afforded only limited access to automated air carriers' airport kiosks.

48.     The ACAA's legislative history makes clear that safety is the only permissible consideration when promulgating regulations which impose restrictions on access for individuals with disabilities.  For example:

   a.   A chief concern that Congress sought to remedy by passing the ACAA was that travelers with disabilities were being "forced to comply with requirements which are unrelated to safety and are not imposed on other travelers."  S. Rep. 99-400 at 3.

   b.   In its Report recommending passage of the ACAA, the Senate Committee on Commerce, Science, and Transportation noted its intent "that airlines will not, in providing air transportation, impose upon handicapped travelers any regulations or restrictions unrelated to safety and unrelated to the nature and extent of any individual's handicap."  *Id.* at 4

   c.   While noting that the Secretary of Transportation was given discretion to promulgate regulations under the ACAA, the Committee "urge[d] that these regulations require that airline procedures for transporting handicapped

individuals distinguish between the differing abilities of handicapped persons, and that any airline procedures applicable only to handicapped passengers be related to safety considerations." *Id.* at 4-5.

d.   In a colloquy on the Senate floor between Senator Robert Dole, the ACAA's principal sponsor, and Senator Howard Metzenbaum, "in order that the intent of S. 2703, the Air Carrier Access Act, may be clarified," 132 Cong. Rec. S11784-08, Senator Dole stated:

> Our intent in S. 2703 is that so long as the procedures of each airline are safe as determined by the FAA, there should be no restrictions placed upon air travel by handicapped persons. Any restrictions that the procedures may impose must be only for safety reasons found necessary by the FAA. Beyond this, the Secretary of Transportation should review each airline's procedures in light of the regulations to be promulgated pursuant to S. 2703 to ensure that the procedures of each airline do not contain discriminatory requirements.

*Id.*

49.   Defendants' improper reliance on a supposed increased cost to airlines associated with purchasing accessible kiosks requires that the Final Rule be held "unlawful and set aside." 5 U.S.C. § 706(2)(A).

50.   Defendants' improper reliance on airlines' costs of complying with the accessibility requirements also produced a Final Rule that that lacks any statutory basis under the ACAA.  The Final Rule must therefore be held "unlawful and set aside."  *Id.* § 706(2)(C)

51.   As a result of Defendants' violation of the APA, Plaintiffs have suffered and will continue to suffer the harm of being discriminated against on account of their disability by being denied equal access to airlines' automated airport kiosks.

52.     Plaintiffs have no adequate administrative remedy for Defendants' unlawful action as described herein.

### COUNT III
### Violation of the APA, 5 U.S.C. § 706(2)(A)
### Improper Reliance on Airlines' Cost of Complying with Accessibility Requirements

53.     Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint, as though fully set forth herein.

54.     The APA requires courts that review agency actions to "hold unlawful and set aside agency action, findings, and conclusions of law" which are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is improper under this standard if the agency has "entirely failed to consider an important aspect of the problem," *Motor Vehicle Mfrs. Ass'n of U.S.*, 463 U.S. at 43, or has failed to consider the relevant factors and explain the facts and policy concerns upon which it relied. *Nat'l Treasury Emp. Union v. Horner*, 854 F.2d 490, 498 (D.C. Cir. 1988).

55.     In the DOT's first rulemaking under the ACAA it determined that "Congress intended section 504 standards to apply to the implementation of the ACAA" and, as a result, "it follows that the regulations may not impose 'undue financial or administrative burdens' . . . or require fundamental changes in the carriers' programs." Nondiscrimination on the Basis of Handicap in Air Travel, 55 Fed. Reg. 8008, 8011 (Mar. 6, 1990).

56.     The DOT further noted that there are certain factors which must be considered when determining where the line between "due" and "undue" burdens should be drawn. Specifically, the DOT noted that profit-making is an "important consideration," but "[o]n the other hand, the overall magnitude of the industry is also a relevant consideration, since the total

resources available to accommodate handicapped persons are significant in an industry of this size." *Id.*

57.     More recently, the DOT has stated that "an action is deemed to be an undue burden if it would require significant difficulty or expense on the part of the covered entity when considered in light of factors such as <u>the overall size of the business, the financial resources of the business, the type of operation, and the nature and cost of the accommodation</u>." Nondiscrimination on the Basis of Disability in Air Travel, 73 Fed. Reg. 27614, 27634 (May 18, 2008) (emphasis added).

58.     In support of the Final Rule, Defendants credited the airlines' assertions that installing accessible kiosks would be "costly."  78 Fed. Reg. at 67908.  As a result, Defendants determined that requiring only "25 percent of airport kiosks [to be] accessible (as opposed to more than 25 percent), in combination with priority access for passengers with disabilities to those kiosks, will enable passengers with disabilities to independently use airport kiosks and limit the additional costs to carriers and airports associated with acquiring and installing accessible kiosks." *Id.*

59.     Defendants, however, considered the cost airlines would incur to meet the kiosk accessibility requirements without taking into account any of the other factors which the DOT itself has previously said are relevant to an "undue burden" analysis such as the overall magnitude of the industry, <u>the financial resources of the business</u>, and the type of operation.

60.     Thus, to the extent that Defendants were permitted to consider the cost of complying with the accessibility requirements at all, the Final Rule is nonetheless "arbitrary and capricious" because Defendants failed to consider the factors relevant to an "undue burden" inquiry and give a reasoned analysis to support their determination that airlines should be

required to incur the cost of making 25 percent of their kiosks accessible, but no more.  Because it is arbitrary and capricious, the Final Rule must be held "unlawful and set aside."  5 U.S.C. § 706(2)(A).

61.     As a result of Defendants' violation of the APA, Plaintiffs have suffered and will continue to suffer the harm of being discriminated against on account of their disability by being denied equal access to airlines' automated airport kiosks.

62.     Plaintiffs have no adequate administrative remedy for Defendants' unlawful action as described herein.

## COUNT IV
## Violation of the APA, 5 U.S.C. § 553(c)
## Improper Reliance on Undisclosed Research and Report of Contractor

63.     Plaintiffs incorporate each and every allegation in the preceding paragraphs of this Complaint, as though fully set forth herein.

64.     In rulemakings such as the one which produced the Final Rule, the APA requires that administrative agencies publish a notice of proposed rulemaking in the Federal Register, "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation," and "[a]fter consideration of the relevant matter presented, the agency shall incorporate in the rules a concise general statement of their basis and purpose."  5 U.S.C. § 553(c).

65.     Part and parcel of the requirements of § 553(c), is the expectation that agencies will disclose, and make available for public comment, the materials on which they have relied in formulating their regulations.  Failing to do so deprives interested parties of their full opportunity to participate in the rulemaking by responding to prior submissions and comments.  It also interferes with the APA's judicial review process.

66.     An agency's failure to disclose the information on which it has relied is a sufficient basis for a reviewing court to order that the matter be remanded to the agency for an additional notice and comment period.  *E.g.*, *Envtl. Def. Fund, Inc. v. Blum*, 458 F. Supp. 650 (D.D.C. 1978).

67.     In developing the Final Rule, Defendants relied on information that was not made available for public comment prior to reaching its decision.

68.     Specifically, the DOT relied on research conducted by its "contractor preparing the regulatory evaluation" when it decided to extend the compliance deadline from 60 days following the effective date of the Final Rule (February 10, 2014) to 36 months following the effective date of the Final Rule (December 12, 2016).

69.     Defendants' Final Rule states:

   a.   "We received very few public comments addressing our questions about the capabilities of the manufacturing sector, none of which came from manufacturers of airport kiosks. However, our contractor preparing the regulatory evaluation contacted a number of manufacturers who confirmed in part what the industry commenters had told us about the longer lead-time required to develop and produce compliant hardware and software applications. They explained that airlines with proprietary kiosks and the in-house capability to program their own software applications would need less time to comply than airlines that contract out software development. Manufacturers that produce shared-use kiosks confirmed the complex development scenario described by the carrier associations, including an initial phase to revise and test the international technical standard that applies to such kiosks. They confirmed that for shared-use kiosks, airports typically procure the hardware and platform software while the airlines must each develop and certify their own compliant software application, which then must be integrated and tested on the hardware—steps that could extend the compliance time frame. The manufacturers also corroborated ITI's observations that requiring only a portion of new kiosks to be accessible would not substantially reduce the development costs for accessible kiosks." 78 Fed. Reg. at 67906-07 (emphasis added).

   b.   "There are no automated airport kiosks presently on the market that meet entire set of the accessibility requirements mandated by this rule, and discussions with kiosk manufacturers confirm airline assertions that it could

take a substantial amount of time to have kiosks with fully compliant hardware and platform software developed, tested, and ready to market for sale. <u>Research conducted by our contractor indicates</u> that the amount of lead time required to develop and produce compliant hardware and software applications will vary significantly depending on whether the kiosks are proprietary or shared-use and whether their capabilities for software application development are in-house or contracted. Airlines with proprietary kiosks and immediate access to applications programming capabilities may be able to develop and deploy compliant kiosks within 18 to 24 months. For carriers that use shared-use kiosks, however, it may take more than two years for accessible kiosks to be ready for installation." *Id.* at 67907 (emphasis added).

70.     On information and belief, Defendants' contractor was Econometrica, Inc.

71.     Econometrica, Inc. prepared the Final Regulatory Analysis (FRA) on the Final Rule on Accessible Kiosks and Websites, which was submitted to Defendants on October 23, 2013 – more than 21 months after the period for public comment on the SNPRM closed on January 9, 2012.  FRA, http://www.regulations.gov/#!documentDetail;D=DOT-OST-2011-0177-0108 (last accessed Jan. 18, 2014).

72.     The FRA was not made available to the public until November 4, 2013, the same date that Defendants announced the Final Rule.

73.     The FRA recites: "Econometrica conducted a series of interviews with companies that manufacture, market, and develop applications for travel and transportation-related kiosks to establish more precisely the time frame in which development of compliant machines and software applications could be reasonably expected."  FRA at 30.

74.     Neither the Final Rule nor the FRA identifies which manufacturers were consulted by Defendants or Econometrica with regard to the necessary timeframe for complying with the accessibility requirements.

75.     The Final Rule and FRA are inconsistent with Defendants' earlier recognition that at least one manufacturer – IBM – had developed an accessible kiosk by at least 2011 when they

issued the SNPRM.  They are also inconsistent with IBM's statement in that it has developed "hardware and software features that are <u>now available</u> in IBM self-service kiosk solutions for hotels and airlines and airports."

76.     Defendants' failure to disclose that conversations with kiosk manufacturers occurred, which manufacturers were consulted, and the substance of those conversations, infringed the right of Plaintiffs, and other interested parties, to meaningfully participate in the rulemaking.  That infringement requires that the concealed details be disclosed and the rulemaking remanded to the DOT for an additional notice and comment period.

77.     Moreover, the Final Rule generated as a result of the improper rulemaking subjects Plaintiffs to the continued harm of being discriminated against on account of their disability by being denied equal access to airlines' automated airport kiosks.

78.     NFB has no adequate administrative remedy for Defendants' unlawful action as described herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and:

1.     Declare that Defendants violated the APA by acting to regulate the accessibility of automated airport kiosks without authority from Congress.

2.     Declare that Defendants violated the APA by improperly relying on airlines' cost of complying with kiosk accessibility standards to conclude that airlines are only required to make 25 percent of their automated kiosks accessible.

3.      Declare that Defendants violated the APA by promulgating the Final Rule insofar as the Final Rule permits airlines to provide less than full access by blind individuals to the airlines' automated airport kiosks, contrary to the ACAA's mandate of nondiscrimination.

4.      Declare that Defendants violated the APA by failing to disclose, and make available for public comment, the contents of their contractor's conversations with kiosk manufacturers.

5.      Vacate and set aside the Final Rule to the extent that it permits airlines to provide less than full access to their automated airport kiosks by blind individuals, contrary to the mandate of the ACAA, and extends the timeframe for airlines to begin complying with the ACAA's mandate of nondiscrimination to December 12, 2016.

6.      Enjoin Defendants, their agents, employees, and successors from applying, enforcing, or relying on the Final Rule to the extent that it permits airlines to provide less than full access to their automated airport kiosks by blind individuals, contrary to the mandate of the ACAA, and extends the timeframe for airlines to begin complying with the ACAA's mandate of nondiscrimination to December 12, 2016.

7.      Award Plaintiffs reasonable attorneys' fees and costs; and

8.      Grant Plaintiffs such other relief as may be necessary and appropriate or the Court deems just and proper.

Respectfully submitted,

*Of Counsel*                                                  _____/s/ Joseph B. Espo_____
Daniel F. Goldstein[*]                                Joseph B. Espo, D.C. Bar No. 429699
Kevin Docherty[*]                                      Brown, Goldstein & Levy, LLP
Gregory P. Care, D.C. Bar No. 989155[*]   120 E. Baltimore Street, Suite 1700
Brown, Goldstein & Levy, LLP                  Baltimore, Maryland 21202
120 E. Baltimore Street, Suite 1700           Phone: 410-962-1030
Baltimore, Maryland 21202                        Fax: 410-385-0869
Phone: 410-962-1030                                  jbe@browngold.com
Fax: 410-385-0869
dfg@browngold.com                                 *Attorneys for Plaintiffs*
kdocherty@browngold.com
gpc@browngold.com

Dated:  January 22, 2014

---

[*] *Pro hac vice* motion to be filed.